## AMSOUTH BANK

v.

## TRAILER SOURCE, INC., et al.

Court of Appeals of Tennessee,
at Nashville.

March 16, 2006 Session.

June 22, 2006.

Stephen V. Petix, San Diego, California, and Richard K. Smith, Nashville, Tennessee, for the intervening defendant and counter-claimant/appellant, Hyundai Translead.

David M. Smythe, Nashville, Tennessee, for the appellee, AmSouth Bank.

## OPINION

WILLIAM B. CAIN, J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., and FRANK G. CLEMENT, JR., J., joined.

Hyundai Translead, an intervenor in AmSouth's claim on a security agreement with debtor Trailer Source, appeals from the trial court's grant of summary judgment against it. Hyundai challenges the

trial court's finding as a matter of law that Hyundai lacked standing to dispute the commercial reasonableness of a sale of the debtor's property. We reverse the grant of summary judgment and remand for further proceedings.

In this appeal, two creditors claim competing interests in the same collateral. AmSouth claims its interest through a 1999 Security Agreement executed by the debtor, Trailer Source, Inc., and AmSouth's predecessor in interest, First American National Bank. First American was granted a security interest in "all of Trailer Source's inventory, accounts receivable and general intangibles and all proceeds thereof." First American properly perfected its security interest by filing a UCC–1 Financing Statement with the Tennessee Secretary of State on July 21,- 1999. This Financing Statement was amended on April 15, 2000. That amendment increased the indebtedness to $640,000. Following an alleged default by Trailer Source, AmSouth, who had since acquired First American National Bank, brought an action to gain possession of the secured collateral.

Hyundai Translead, Inc., claims its interest stems from a Settlement Agreement it executed with the defendant debtors, Trailer Source, Inc., et al., Southern Trailer, Inc., and certain other individuals. The details of this agreement appear in Hyundai's Answer and Counterclaim:

7. On or about August 19, 2002, Counter–Claimant Hyundai entered into a Settlement and Security Agreement with Southern Trailer, and with Defendants Trailer Source, Jackson Truck & Trailer Repair ("Jackson Truck"), Jeff Davis, Raleigh J. Williams, James A. Harrell, and with others not named as Defendants herein, in order to settle pending litigation concerning the indebtedness of Southern Trailer, and to se-

cure the payment of the $20,960,000 debt.

8. Central to the Settlement and Security Agreement was the establishment of a trust account (No. 1108) at First Bank, 345 Highway 46 South, Dickson, Tennessee, entitled "Trailer Source, Inc. and Southern Trailer & Equipment Sales, Inc. Receivables Account f/b/o [for the benefit of] Hyundai Translead" (a/ k/a the "Lockbox Account"). Pursuant to the terms of the Settlement and Security Agreement, Hyundai deposited approximately 621 certificates of title to Proceeds Trailers, and Southern Trailer and/or Defendant Trailer Source was supposed to deposit approximately 1,431 such certificates of title.

9. Under the terms of the Settlement and Security Agreement, together with those of a related Lockbox Account Agreement, of August 22, 2002, Southern Trailer and Defendant Trailer Source granted to Hyundai a security agreement in all of the certificates of title deposited Into the Lockbox Account, as well as all the cash proceeds deposited into the Lockbox Account arising from the sale or lease of the Proceeds Trailers. Further, under said agreements all revenues deposited into the Lockbox Account became the property of Hyundai and Southern Trailer. Defendant Trailer Source had no interest in such revenues or any control over the Lockbox Account, other than as stated in the Settlement and Security Agreement. [Lockbox Account Agreement, para. 1.] Under the Settlement and Security Agreement, Hyundai was entitled to receive from the Lockbox Account, on at least a monthly basis, 75% of the gross revenues of Southern Trailer and Defendant Trailer Source in connection with the sale, lease or other disposition of the Proceeds Trailers and

50% of the net profits from the sale of new Hyundai trailers, with only the remainder going to Southern Trailer and Trailer Source. [Settlement and Security Agreement, para. 4.4.3.]

Although the Agreement was executed in August of 2002, Hyundai failed to perfect its security interest until September 23, 2003, only one day prior to the first sale of collateral of which Hyundai complains. The dispute between the two creditors began when AmSouth Bank filed its Verified Complaint and Action to Recover Personal Property against the defendant debtors on September 15, 2003. The Complaint alleged that at the time of default, Trailer Source owed $281,969.04 plus interest. AmSouth prayed for the following relief:

1. That Plaintiff be granted a Judgment for immediate possession of all the inventory, accounts and general intangibles (the "Collateral") of Defendant Trailer Source at such place or places as such collateral may be found.

2. That Plaintiff be permitted to exercise its rights as a secured creditor regarding the inventory, accounts and general intangibles and that it be permitted to notice and conduct a UCC Sale of all inventory and intangibles and that it be permitted to collect the accounts pursuant to the provisions of its Security Agreement and the Uniform Commercial Code.

3. That Plaintiff be granted a judgment against the Defendants, jointly and severally, for all balances owing under the Note, less any net credits received from any UCC Sale of inventory and intangibles and/or the collection of the accounts.

Consistent with the Complaint, AmSouth obtained two expedited writs of possession directing the Dickson County Sheriff to seize the very certificates of title and accounts referenced in the Hyundai Translead Settlement Agreement. In addition, the Bank had allowed Trailer Source to enter into an agreement conveying 241 of these certificates to its vendee, Fleetco, at a price of $500 per trailer. On October 7, 2003, Hyundai moved to intervene to protect its interest in the collateral and challenge the actions of AmSouth in seizing the collateral and allowing its disposition. Hyundai alleged priority interest in the Lockbox Account seized and argued that the disposition of property was commercially unreasonable.

On May 26, 2004, AmSouth filed its first Motion for Partial Summary Judgment seeking the dismissal of "Hyundai's UCC–1 priority claims." On August 6, 2004, the trial court granted AmSouth's Motion.

The Court finds there are no genuine issues of material fact in dispute that the 415 used over the road trailers represented by the 415 certificates of title which were recovered from the FBO account on deposit with First Bank in September 2003 were in the possession of Trailer Source, Inc. at the time the Writs of Possession were served by the Dickson County Sheriff. The Court further finds that no notification of either a purchase money security interest and/or any consignment interest in any of the 415 trailers had ever been sent to AmSouth by either Hyundai Translead and/or other party as required by the Uniform Commercial Code. As a result, the Court finds that AmSouth Bank holds a first lien priority security interest in the 415 trailers by virtue of its prior UCC Filing in the inventory of the Defendant Trailer Source, Inc. per its UCC Filing with the Tennessee Secretary of State on July 21, 1999, which was subsequently continued by an In–Lieu Continuation Statement Filing with the

Delaware Secretary of State on May 25, 2004.

The Court further finds there are genuine issues of material fact in dispute as to whether Hyundai Translead had control of the FBO Account proceeds at the time service of the Writ of Possession on those proceeds on September 26, 2003 and that those issues of fact need to be resolved at a trial of this matter. The Court specifically makes the following finding of fact with regard to the FBO Account proceeds. In the event the Court rules that the FBO Account is in fact a control account for purposes of the Uniform Commercial Code, the Court finds there are no genuine issues of material fact in dispute that Hyundai Translead's control in the FBO account extended to only 75% of the account proceeds and that the remaining 25% account proceeds were the property of the Defendant Trailer Source, Inc. Because AmSouth Bank's first lien UCC security interest in inventory of this Defendant also extended to proceeds of that inventory, AmSouth Bank also has a perfected UCC lien interest in those proceeds.

On September 10, 2004, Hyundai filed its Motion for Partial Summary Judgment Confirming its Priority Claim, Payment of Certain Proceeds and for an Order of Reference to Mediation. This Motion concerned Hyundai's claim to at least 75 percent (75%) of the $410,062.36 in cash AmSouth had seized from the Lockbox Account at First Bank in Dickson. This Motion was granted on November 12, 2004. The trial court ordered that $307,546.77 "remain on deposit with AmSouth Bank until further order of the court and accrue interest in favor of Hyundai Translead."

■ After the resolution of the issues concerning cash seized by AmSouth, Hyundai's priority claims concerning the title certificates and the sales of certain of Trailer Source's inventory remained for disposition. On January 21, 2005, AmSouth filed its Second Motion For Summary Judgment and For Entry of Final Judgments Regarding its Claims for Monies Owed Against the Defendants and Dismissing All Remaining Claims of Hyundai Translead. In a memorandum and order entered April 6, 2005, the trial court granted the motion in part and dismissed Hyundai's claim as to the September 24, 2003, trailer sales. The trial court designated this order as a Final Judgment pursuant to Tennessee Rule of Civil Procedure 54.02, finding no just cause for delay. The instant appeal centers around the following language of the trial court's order:

2. The Court grants summary judgment and dismisses Hyundai's claim as to the trailers sold on September 24, 2003. The Court concludes as a matter of law that Hyundai was not a perfected security creditor of Trailer Source for purposes of Tennessee Code Annotated sections 47–9–610 and 611 at least 10 days prior to either the invoice date for the September 24, 2003 sale or with 10 days prior to the Bank's receipt of the purchase proceeds for the sale on September 24, 2003, because Hyundai had not filed a competent security interest adequately describing the collateral. That deficiency was rectified by Hyundai on September 23, 2003, when it filed an original Exhibit A property description with the Delaware Secretary of State (Undisputed Facts Nos. 33 and 34). Accordingly, Hyundai was not entitled to receive notice of the September 24, 2003 sale because it was not a perfected secured creditor of Trailer Source, and *Hyundai has no standing to contest the commercial reasonableness of the September 24, 2003 sale.*

The trial court further held:

3. As to Hyundai's claims for recovery of consequential damages for commercially unreasonable sales of 38 trailers subsequent to September 24, 2003, which sales occurred in November and December of 2003, the Court denies summary judgment. There are genuine issues of material fact as to whether control of the sales is attributable to Trailer Source or the Bank, *see In re Alcock,* 157 B.R. 23 (9th Cir.BAP1993) and, thus, whether liability for conducting a commercially unreasonable sale is attributable to the Bank.

. . .

6. With respect to Hyundai's claim for recovery of attorney's fees pursuant to Tennessee Code Annotated section 47–9–625(b), the Court holds as a matter of law that should Hyundai prevail on its claim that the Bank had constructive possession of the 38 trailers sold subsequent to September 24, 2003, and that the Bank controlled the sale and that the sale was commercially unreasonable, Hyundai is entitled to recover as consequential damages not only the difference between the price obtained for the collateral and the fair market value of the collateral but also the attorney's fees and expenses it has incurred in pursing those remedies.

It is therefore ORDERED that the Court grants the plaintiff's motion for summary judgment to the extent that Hyundai's claims as to trailers sold on September 24, 2003, are dismissed with prejudice and Hyundai's claims of conversation, trespass to chattels and interference with prospective economic advantage are dismissed with prejudice. The Court enters its summary judgment as a Final Judgment there being no just reason for delay.

Hyundai asserts on appeal:

1. Whether the trial court erred in holding that Hyundai Translead, despite having a perfected security interest in certain collateral at the time of its disposition, did not have standing to claim damages for AmSouth Bank's failure to dispose of said collateral in a commercially reasonable manner.

2. Whether the trial court erred in holding that Hyundai Translead lacked standing to claim damages under Section 47–9–625 of the Tennessee Commercial Code, solely because it was not entitled to notice of the proposed disposition of collateral under the terms of Section 47–9–611 of the Code.

3. Whether the trial court erred in failing to consider whether AmSouth Bank had a good-faith obligation to provide Hyundai Translead with notice of the proposed disposition of collateral, despite the Bank's actual knowledge that Hyundai had a security interest in the collateral well before the date of sale.

Aside from questions of good faith, the scope of this appeal is limited to the narrow issue on which the trial court granted summary judgment to AmSouth in paragraph 2 of its April 6, 2005, Order, that issue being the standing of Hyundai to contest the commercial reasonableness of the September 24, 2003, sale.

Article 9 of the Uniform Commercial Code brought under a single umbrella a wide variety of pre-Code security devices, but the Article was not drafted in a vacuum without due regard to pre-Code history.

Although Article 9 is the most innovative Code article, it did not spring full grown from the forehead of Grant Gilmore or Allison Dunham, or even Karl Llewellyn. The drafters drew heavily

on a large body of pre-Code personal property security law. In pre-Code days, the lawyer had to work with a variety of security devices, each governed by its own law. These included the pledge, the chattel mortgage, the conditional sale, the trust receipt, and the factor's lien.

4 JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 30-1 (4th ed.1995). (footnote omitted)

The duties of a secured party after default, relative to the disposition of collateral as provided in Tennessee Code Annotated section 47–9–610 *et seq.*, require a "commercially reasonable disposition" much akin to pre-Code requirements in conditional sales of personal property. In conditional sales, the seller's right to retain title and regain possession following default by the buyer was conditioned upon a buyer's post-delivery failure to perform, i.e. pay full purchase price on its account. This right was established at Common Law long before statutory innovations. *Gambling v. Read,* 19 Tenn. 281 (Tenn. 1838). New York and Tennessee pioneered statutory innovations designed to also protect the interest of the conditional vendee. *Rice v. Lusky Furniture Co.,* 167 Tenn. 202, 68 S.W.2d 107, 108 (1934). Compulsory resale of repossessed collateral was born in Tennessee with Chapter 81 of the Public Acts of 1889. The effect of this statute was explained by the Supreme Court shortly after its enactment.

The object and intent of this statute are plain. By the words employed, both seller and purchaser are recognized as having interests in the property contemplated, and by them provision is made for the full protection and enforcement of their respective rights. The seller is interested to the extent of his unpaid debt against the property, and what is left after the payment of that debt belongs to the purchaser. The seller is not allowed to regain the property for which he has received a part of the price, and, without more, hold it as his own, in disregard of the purchaser's interest, as the defendant in the case at bar attempted to do; but, having regained the property, he must sell it as provided in the first section of the act, and, after retaining the sum sufficient to pay the balance due him on the price, and the expenses of the sale, pay the surplus, if any, to the original purchaser. If he choose to hold the property without sale, or waiver of sale, as the defendant before us has done, then, under the fourth section, he becomes unconditionally liable to the purchaser for the full amount of the consideration paid. By disregarding the requirement of the first section, the seller's liability to the purchaser becomes absolute, under the fourth section. In that case the seller will not be heard to dispute his liability for the full amount received, or allowed to diminish it by any claim for use of the property, while in the hands of the purchaser. The sale and delivery to the purchaser contemplate that he shall use the property as his own, so long as he is not in default as to some deferred payment, and, in fact, until the seller shall seek to regain possession. That is his right under the law of his contract, and by its enjoyment he incurs no liability to the seller. If the property shall deteriorate in value while in the possession of the purchaser, the seller, upon recovering it, can protect himself by sale under the first section of the act, and by suit under the third section, for such balance of his debt as may remain unpaid after the application of the proceeds of sale. At least, that is the course pointed out to him by the plain terms of the act; and he must follow it, or suffer the consequences of his failure to do so. If he

ignore the remedy thus expressly pronounced, and assume to be a law unto himself, by appropriating the property as reclaimed, and without a resale, he becomes bound to repay the purchaser the full amount received from him, without abatement for use of otherwise. The duty of the original seller to resell the property upon reclamation by him is positive, and failure to perform that duty fixes upon him absolute responsibility to the purchaser for the purchase money previously paid.

*Cowan v. Singer Manuf'g Co.*, 92 Tenn. 376, 21 S.W. 663, 665 (1893).[1]

While Chapter 15 of the Public Acts of 1899 (codified as part of Tennessee Code Annotated 47–1301 prior to the Uniform Commercial Code) required a conditional sales contract to be evidenced by a written contract or memorandum executed at the time of the sale, such a writing unknown to creditors of the vendee in possession provided no benefit to persons dealing with the property in the hands of the vendee. The resulting problem is stated by the United States Fourth Circuit Court of Appeals applying Maryland law.

At common law, the doctrine is well established that in conditional sales the mere transfer of possession of the property by the seller to the buyer, without any further elements on which an estoppel might be invoked against the seller, still leaves the claim of the seller in the property paramount to the claims of creditors of, or bona-fide purchasers from, the buyer. Sometimes this doctrine brought hardship to such creditors or purchasers; so that, to obviate this hardship, recordation statutes, similar to the instant Maryland Statute, have been enacted in many states.

Thus in 3 Jones on Chattel Mortgages and Conditional Sales, Section 1072, page 148, it is said: "The common-law rule being that in all cases the ownership of a conditional vendor of personal property is paramount to the claims of purchasers from, or creditors of, the conditional vendee irrespective of notice of any kind, the recording statutes were designed in derogation of this rule and to circumvent its supposed unjust operation to the detriment of persons dealing with the conditional buyer on the appearances of ownership which the possession of property indicates, and whom the law benevolently designates innocent purchasers and creditors."

In Vold on Sales, page 299, it is said: "In conditional sales transactions the problem of *hardship on parties dealing with the conditional buyer in possession* through the secret reserved interest of the conditional seller is very similar to that which is so familiar in connection with chattel mortgages" . . . "in a large majority of states at the present time the problem of the secret lien in favor of the conditional seller is met by statutes somewhat analagous to chattel mortgage recording acts requiring the filing or recording of conditional sale contracts." (Italics added.)

*In re Imperial Brewing Co.*, 127 F.2d 766, 769–70 (4th Cir.1942).

Tennessee Code Annotated section 47–1301 requiring title retention to be in writing was strictly construed in recognition of

---

**1.** With minor modifications, the provisions of Chapter 81 of the Public Acts of 1889 remained in effect codified as Shannon's Code, section 3666, *et seq.*, section 7287, *et seq.* of the Code of 1932 and Tennessee Code Annotated section 47–1301, *et seq.* until the enactment of the Tennessee version of the Uniform Commercial Code by Chapter 81 of the Public Acts of 1963, the pertinent provisions of which were codified as Tennessee Code Annotated 47–9–501, *et seq.*

the same problems pointed out in *In re Imperial Brewing Co.* In *Matthews v. Archie,* 196 Tenn. 417, 268 S.W.2d 334 (1954), the contract relative to the sale of an automobile was inartfully drawn and was held not to constitute a conditional sales contract. The Court held:

> In the contract before us, there is no language whatsoever, to express an intention of the parties that title should remain in Matthews, the vendor. The required expression of title retention is not met. *Kenner & Co. v. Peters,* 141 Tenn. 55, 206 S.W. 188; *Sanders v. Farmers Union Co.,* 5 Tenn.App. 560. Unless the language of the contract clearly makes out a conditional sale, this Court will not extend the law of Conditional Sales by implication, since those laws are essentially out of harmony with our registration laws. *Star Clothing Manufacturing Co. v. Nordeman,* 118 Tenn. 384, 100 S.W. 93; *Baker v. Dew,* 133 Tenn. 126, 179 S.W. 645; *Commerce Union Bank v. Jackson,* 21 Tenn.App. 412, 111 S.W.2d 870.

> If there is doubt whether or not the contract presented is or is not a contract of conditional sale, the doubt will be resolved against holding such contract a conditional sale. *Great American Indemnity Co. v. Utility Contractors,* 21 Tenn.App. 463, 111 S.W.2d 901; *Sweeney v. Mergenthaler Linotype Co.,* 8 Tenn.Civ.App. 244.

*Matthews,* 268 S.W.2d at 336. (Overruled on other grounds, *Hart v. Pitts,* 213 Tenn. 412, 374 S.W.2d 379 (1964).)

It is against this background of common law development augmented by statutory enactments that the drafters of the Uniform Commercial Code undertook in Article 9 of that Code to address the subject of "secured transactions." Shortly after Tennessee adopted the Uniform Commercial Code, the Supreme Court observed:

> The Uniform Commercial Code in T.C.A. Section 47–9–101 et seq., has as its purpose to provide a simple and unified structure within which the immense variety of present-day secured financing transactions can go forward with less cost and with greatest certainty. See comments to official text, T.C.A. Section 47–9–101. In addition, the traditional distinction among security devices, based largely on form, are not retained. The single term "security interest," applies to all transactions intended to create security interests in personal property and fixtures, even though the old descriptive terms such as chattel mortgages, conditional sales, trust receipts, factors liens, etc., may still be used. See T.C.A. Section 47–9–102.

*Phifer v. Gulf Oil Corp.,* 218 Tenn. 163, 401 S.W.2d 782, 785 (1966).

In the present posture of this case, we need not delve too deeply into the intricacies of priorities among creditors under Tennessee Code Annotated 47–9–301 *et seq.* The sole issue before the Court is whether or not Hyundai has standing to contest the commercial reasonableness of the September 24, 2003, sale of collateral. In determining this issue, it is well to remember that:

> The primary focus of a standing inquiry is on the party, not on the merits of the claim. *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 484, 102 S.Ct. 752, 765, 70 L.Ed.2d 700 (1982); *Flast v. Cohen,* 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968); *City Communications, Inc. v. City of Detroit,* 888 F.2d 1081, 1086 (6th Cir.1989); *National Fed'n of Fed. Employees v. Cheney,* 883 F.2d 1038, 1041 (D.C.Cir.1989). Thus, a party's standing does not depend on the likelihood of success of its claim on the merits. *Hill*

*v. City of Houston,* 764 F.2d 1156, 1159–60 (5th Cir.1985).

Even though standing does not depend on the merits, it often turns on the nature and source of the claim asserted. Thus, the inquiry requires a "careful judicial examination of the complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted." *Allen v. Wright,* 468 U.S. at 752, 104 S.Ct. at 3325.

*MARTA v. Metro. Gov't. of Nashville,* 842 S.W.2d 611, 615 (Tenn.Ct.App.1992).

In paragraph 16 of its countercomplaint, Hyundai asserts that "AmSouth released directly to Trailer Source some 240 trailer certificates of title out of the 280 certificates which it had initially seized from the Lockbox Account, to facilitate a sale of those 240 trailers at a price of $500.00 each, which was at least $2,000.00 below their lowest fair market value. The $120,000.00 proceeds of this sale was paid directly to AmSouth." Hyundai further avers that such sale was commercially unreasonable. Under such allegations, the value of the collateral involved in the September 24, 2003 sale standing alone would have exceeded the maximum amount of the debt, which is the subject of the security interest of AmSouth ($381,969.04 as of September 5, 2003).

▬ Since Hyundai did not perfect its security agreement until September 23, 2003, the trial court correctly found that it was not a secured creditor entitled to notice under Tennessee Code Annotated 47–9–610 and 611. This admitted fact, however, does not render Hyundai without standing to contest the commercial reasonableness of the September 24, 2003 sale. While failure to perfect a security interest drives the creditor to the bottom of the totem pole in priority, such does not de-

stroy his interest in the property. As observed by one authority:

6.01 Weaknesses of an Unperfected Security Interest

A security interest that is unperfected but has attached is enforceable against both the debtor and general unsecured creditors. Rev. UCC § 9–201(a). However, an unperfected security interest (or agricultural lien) still has a multitude of weaknesses. Rev. UCC § 9–317 lists these infirmities:

- It loses to competing secured creditors who have properly perfected.
- It loses to unsecured creditors who become lien creditors through judgment and levy. This includes the debtor's trustee in bankruptcy. One change made by the revision is that a judicial lien that arises after a financing statement is filed but before the security interest attaches and becomes perfected is subordinate to *all* future advances made by the secured creditor within 45 days after the person becomes a lien creditor, even the first advance. Rev. UCC § 9–317(a)(2). This point was unclear under prior law.
- It loses to buyers of tangible chattel paper, documents, goods, instruments, or the holder of a certificated security, if the buyer gives value and receives delivery without knowledge of the unperfected security interest. Rev. UCC § 9–317(b).
- It loses to bona fide lessees of goods and bona fide licensees of intangibles who give value without knowledge of the unperfected security interest. Rev. UCC §§ 9–317(c), (d).

The moral of these basic priority rules is that, while an unperfected security interest has some value, perfection is required to protect it against a variety of third-party competitors.

Barkley Clark, Shook, Hardy & Bacon, LLP, Secured Transactions Under Revised Article 9 of the UCC ¶ 6.01 (1999).

■ The legal concepts of attachment and perfection are separate and distinct elements under the Uniform Commercial Code. The first concept has to do with the creation of an enforceable interest in the property. The second concept has to do with the priority of the creditor. Attachment occurs at the instant of creation of an enforceable security interest. Tenn.Code Ann § 47-9-203. Perfection occurs upon the filing of a Financing Statement if such is required under the code. Tenn.Code Ann. § 47-9-303.

It does not appear as a matter of law from the record before the Court that creditors with higher priority than Hyundai intervened between the priority of AmSouth and the alleged lower priority of Hyundai. Tennessee Code Annotated 47-9-625 is not limited in its applicability to persons entitled to notice under Tennessee Code Annotated 47-9-610 and 611. It also applies to persons who "held a security interest in or other lien on the collateral." (Tenn.Code Ann. § 47-9-625(c)(1)). If the meaning of this provision were otherwise unclear, the comments to the official text further state, "Subsection (c) also affords a remedy to an aggrieved person who holds a competing security interest or other lien, regardless of whether the aggrieved person is entitled to notification under part 6." Since the only basis on which the trial court denied standing to Hyundai was because it was not a "perfected secured creditor" entitled to notice under Tennessee Code Annotated 47-9-610 and 611, the position of the trial court cannot be sustained. Hyundai holds a competing security interest, albeit an unperfected security interest low in priority, and is thus an aggrieved person under Tennessee Code Annotated 47-9-625(c) in spite of the fact

that it is not entitled to notice under Tennessee Code Annotated 47-9-610 and 611.

The undisputed facts establish that, whether perfected or not, Hyundai was a creditor of AmSouth's debtor Trailer Source. The plain language of the Security and Settlement Agreement filed as an exhibit to Hyundai's Answer and Counterclaim and referenced in AmSouth's 56.03 Statement of Undisputed Facts clearly outlines the indebtedness and the security interest grant.

4.1. *The Cash Payment Obligation.* Pursuant to the terms of this Agreement, Southern Trailer and Trailer Source jointly and severally agree and promise to pay to Hyundai, in cash, the total sum of $20,960,000 (the "Cash Payment Obligation") on July 31, 2008 (the "Final Payment Date"), together with interest as provided in Section 4.1.1. The Case Payment Obligation and interest thereon shall be due as set forth in this Section 4.1 and Sections 4.2, 4.3 and 4.4 below.

. . .

7.1. *Security Interest.* To induce Hyundai to enter into this Settlement Agreement, and as security for the prompt payment and performance of all its obligations under this Settlement Agreement, Southern Trailer and Trailer Source each hereby mortgages and assigns and grants to Hyundai a security interest in, and lien upon, the Collateral (as defined herein), which security interest shall attach without any further action by any person.

While the issue raised by Hyundai relative to "good faith" is limited to the failure of AmSouth to provide notice to Hyundai of the September 24, 2003 sale and we have held that such notice is not required as to the standing issue, it is well to note that the "good faith" requirements of Tennessee Code Annotated 47-1-203 permeate

all provisions of the Uniform Commercial Code including Article 9 Transactions involving security interests. QUINN'S UNIFORM COMMERICAL COMMENTARY AND LAW DIGEST, 2d Ed. Vol. I, § 1–203[A][6]; *Thompson v. United States,* 408 F.2d 1075 (8th Cir.1969); *Limor Diamonds, Inc. v. D'Oro by Christopher Michael, Inc.,* 558 F.Supp. 709 (So.Dist.N.Y.1983); *General Ins. Co. of America v. Lowry,* 570 F.2d 120 (6th Cir.1978).

■■■■ The well settled standard of review following grant in the trial court of this limited summary judgment require that we take the strongest legitimate view of the evidence in favor of the non-moving party, allow all reasonable inferences in its favor and discard all countervailing evidence. *Byrd v. Hall,* 847 S.W.2d 208 (Tenn.1993). If we determine that a dispute exists as to any material fact or there is any doubt as to the existence of a material fact, the grant of summary judgment cannot stand. *EVCO v. Ross,* 528 S.W.2d 20 (Tenn.1975).

Viewing the evidence in the light most favorable to Hyundai, even if it is conceded that AmSouth has priority as to all of the collateral, that interest was limited to paying the total balance of the underlying debt to AmSouth which as of September 5, 2003 was $381,969.04. As a creditor of lower priority, Hyundai cannot prejudice the superior rights of AmSouth even though the lower priority debt to Hyundai at the time of the September 24, 2003 sale of collateral exceeded $16 million. Hyundai offers proof that the 241 trailers sold on September 24, 2003 for $120,500 in fact had a fair market value in excess of the total debt then owed to AmSouth. If such in fact be true, the entire $381,969.04 owed to AmSouth could have been realized from a commercially reasonable sale of the 241 trailers, not only leaving a balance above and beyond the payoff to AmSouth, but also freeing up all other collateral for application to the debt owed to Hyundai. Under such circumstances, the priority secured creditor cannot disregard its duties to subordinate creditors in its disposition of the collateral. Such was the law long before the Uniform Commercial Code was adopted and such is the requirement of Tennessee Code Annotated 47–9–610.

None of the issues drawn by the pleadings have yet been resolved in this case. When the facts are fully developed, AmSouth may well prevail against the counterclaims of Hyundai as to these issues drawn between the parties. The only issue resolved on this record is the standing of Hyundai to contest the commercial reasonableness of the sale of 241 trailers on September 24, 2003. For reasons stated herein, we hold that Hyundai has such standing. Whether or not such standing will lead to success by Hyundai on any issues is yet to be determined.

Judgment of the trial court is reversed and the case remanded for further proceedings. Costs are assessed to AmSouth Bank.