# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### February 18, 2009 Session

## REGIONS BANK v. TRAILER SOURCE, ET AL.

**Appeal from the Chancery Court for Davidson County**
**No. 03-2714-III      Ellen H. Lyle, Chancellor**

---

**No. M2008-01167-COA-R3-CV - Filed May 21, 2010**

---

A junior creditor sued the senior creditor claiming that the senior creditor's involvement in the sale of collateral, used trailers for tractor-trailer trucks, was commercially unreasonable. We agree with the trial court that the senior creditor, a bank, was subject to the commercially reasonable disposition of collateral rule. However, we hold that the bank's approval of the sale, arranged by the debtor, was not commercially unreasonable. Consequently, we reverse the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed**

PATRICIA J. COTTRELL, P.J.,M.S., delivered the opinion of the court, in which FRANK G. CLEMENT, JR. and ANDY D. BENNETT, JJ., joined

David Murray Smythe, Nashville, Tennessee, for the appellant, Regions Bank.

Stephen V. Petix, San Diego, California; Richard Knell Smith, Nashville, Tennessee; Fred M. Acuff, Jr., Memphis, Tennessee, for the appellee, Hyundai Translead.

## OPINION

This case concerns claims by a creditor that another creditor with priority sold collateral securing both loans in a commercially unreasonable manner in violation of the Tennessee Uniform Commercial Code, Tenn. Code Ann. § 47-9-610. The collateral at issue is used semi-truck trailers.

# I. BACKGROUND

Trailer Source, Inc. ("Trailer Source"), as the name implies, sold new and used semi-truck trailers from its principal place of business in Nashville. Often Trailer Source would acquire the used trailers as trade-ins when a customer bought a new trailer. Trailer Source would also sell these used, traded-in trailers. This appeal involves the used trailers owned by Trailer Source and used by Trailer Source as collateral for loans.

Regions Bank ("Bank") loaned money to Trailer Source and had a perfected security interest in the used trailers held by Trailer Source. Hyundai Translead ("Hyundai") manufactured new trailers sold by Trailer Source. Hyundai acquired a junior security interest in the used trailers owned by Trailer Source subordinate to the Bank's interest by virtue of an agreement with various parties, including Trailer Source.

This lawsuit was initiated when the Bank sued Trailer Source on September 15, 2003, seeking a judgment that Trailer Source was in default on its loan and seeking possession of its collateral.[1] Hyundai later intervened on October 7, 2003, since the Bank and Hyundai had security interests in the same collateral. Hyundai filed a counterclaim against the Bank, asserting, among other things, that it was entitled to recover damages from the Bank since the Bank allegedly failed to dispose of the collateral, *i.e.*, the used trailers, in a commercially reasonable fashion in violation of Tenn. Code Ann. § 47-9-610.

Since the issue on appeal is a part of much larger transactions, we must first describe what is not in dispute in order to provide a context for the issues on appeal. Second, we will discuss how the Bank and Hyundai acquired their interests in Trailer Source's used trailers. Third, we will discuss how the Bank participated in the disposal of the used trailers, which Hyundai alleges violated Tenn. Code Ann. § 47-9-610. Finally, we will examine the trial court's decision and the particular issues raised by the Bank about the disposition on appeal.

## A. Facts Not In Dispute

It is helpful to note at this point what is not disputed. It is not disputed that Trailer Source defaulted under its separate obligations to the Bank and Hyundai; that the used trailers were collateral for Trailer Source's obligations to both the Bank and Hyundai; and that the Bank and Hyundai are entitled to claim as collateral the used trailers to satisfy the debts of Trailer Source. In this appeal, the debtor, Trailer Source, does not claim that the

---

[1] In addition to Trailer Source, the defendants included a corporation and individual defendants who allegedly guaranteed Trailer Source's debt. These parties are not involved in this appeal. Trailer Source is in bankruptcy.

Bank or Hyundai violated any agreement or law. This dispute is solely between two creditors, the Bank and Hyundai, with interest in the same collateral. Both creditors agree that their security interests are governed by the Tennessee Uniform Commercial Code, Tenn. Code Ann. § 47-9-101 *et seq.*[2]

It is undisputed on appeal that the Bank perfected its security interest in the used trailers before Hyundai perfected its interest in the same collateral. Accordingly, it is undisputed that the Bank has priority to the used trailers so that proceeds from their sale must first be used to extinguish the Bank's debt. In the normal course, as a junior creditor, the proceeds from the used trailer sales can be used to satisfy Hyundai's debt only after the Bank's debt is satisfied.

Hyundai, however, lays claim to the proceeds of the used trailer sales by arguing that the Bank violated the commercially reasonable requirement of Tenn. Code Ann. § 47-9-610 when, admittedly in exchange for the proceeds of the sale, the Bank consented to sales of the used trailers in the fall of 2003 and released the trailers' certificates of title.

## B. Acquisition of Security Interests in the Used Trailers by the Bank and Hyundai

The Bank[3] made commercial loans to Trailer Source for $640,000. These loans were duly secured by assignment to the Bank of the accounts, inventory, and general intangibles of Trailer Source. Included in the collateral were used trailers that Trailer Source accepted as trade-ins when Trailer Source sold new trailers. There is no dispute that the Bank had a perfected security interest, including the used trailers, beginning in July of 1999.

Trailer Source failed to make payments to the Bank in September of 2003 when the debt totaled $381,969.04, with interest continuing to accrue. After notice, the Bank filed this suit on September 15, 2003, to collect on the loan and take possession of its collateral, including the inventory. The Bank's verified complaint asked the trial court that the Bank be "permitted to exercise its rights as a secured creditor regarding the inventory . . . and that it be permitted to notice and conduct a UCC Sale of all inventory . . . ." The complaint also alleged that the Bank was "entitled to the issuance of an Ancillary Expedited Writ of

---

[2] The parties agree that the Uniform Commercial Code governs this disagreement and no one argues that the certificate of title statutes govern. Even if trailers are covered by certificate of title statutes governing security interests, if the trailers are inventory held for sale by a person in the business of selling trailers, then the Uniform Commercial Code applies to the security interest. Tenn. Code Ann. § 47-9-311(d), comment 4.

[3] The loan was actually made by the Bank's predecessor, AmSouth Bank.

Possession for service by the Dickson County Sheriff on all accounts of Defendant Trailer Source, Inc. with First Bank . . Dickson, Tennessee, including . . . all trailer certificates of title held by that Bank or located in Drop Box #1108 at that Bank."

Writs of possession were served on the First Bank in Dickson which, for reasons that will be discussed, held certificates of title for used trailers owned by Trailer Source and a cash account representing proceeds from sales of trailers owned by Trailer Source. In response to the writs of possession, the First Bank of Dickson turned over to the Bank the certificates of title and the cash account.[4] The trial court's order giving the Bank possession of these certificates of title is not challenged on appeal.

As part of a dealership arrangement, Hyundai sold new trailers to a third party, Southern Trailer, who in turn sold the new trailers to Trailer Source. However, when Trailer Source was unable to pay for the new trailers in 2002, Hyundai sued both the third party and Trailer Source. As a result of the lawsuit, Hyundai, Trailer Source and others entered into a Settlement and Security Agreement on June 20, 2002, and a Lockbox Account Agreement in August of 2002, securing an indebtedness to Hyundai of approximately $20 million dollars (collectively referred to herein as "Hyundai Agreement"). As part of the Hyundai Agreement, Trailer Source gave Hyundai a security interest in the used trailers it owned.[5] Hyundai admits it was aware of the Bank's senior perfected security interest in these trailers in June of 2002 when Hyundai's interest in the used trailers arose.

Part of the Hyundai Agreement provided that all parties were to deposit the certificates of title for the used trailers in a lockbox account at First Bank of Dickson. All proceeds from the sale of the used trailers were to be apportioned among Hyundai, Trailer Source, and Southern Trailer as per the Hyundai Agreement. For the used trailers owned by Trailer Source, Hyundai received 75% of the sales proceeds and Trailer Source received 25%.

Hyundai's attempt to perfect a security interest in these used trailers met with frustration. First, Hyundai filed a UCC statement in Delaware where Trailer Source was incorporated but failed to attach the description of collateral. It was not until fifteen (15) months after Hyundai acquired a security interest in the used trailers that Hyundai's security interest in those trailers was perfected. It is undisputed that Hyundai's security interest in the used trailers was not perfected until September 23, 2003.

_____

[4]The competing claims to these proceeds totaling $410,062.36 were decided by the trial court on summary judgment and are not a subject of this appeal.

[5]The Hyundai Agreement gave Hyundai a security interest in 1,431 used trailers owned by Trailer Source and Southern Trailer without specifying who owned which used trailers.

-4-

Subsequently, under the Hyundai Agreement, Hyundai approved all sales of used trailers made by Trailer Source starting in August of 2002, released the certificates of title to the buyers as these sales were made, and received 75% of the proceeds of the sale. This arrangement continued until September of 2003 when the Bank successfully petitioned the trial court to obtain possession of the certificates of title.

## C. Disposal of the Used Trailers

At the time the Bank sued Trailer Source, Trailer Source owed the Bank $381,969.04 and owed Hyundai over $16,000,000. The trial court found, and it is not disputed on appeal, that the Bank was not aware that Hyundai had an interest in the used trailers until "sometime between September 3 and September 19, 2003."

As discussed earlier, through a writ of possession the Bank obtained certificates of title for used trailers owned by Trailer Source on September 18, 2003. In the first sale of used trailers, Trailer Source had negotiated the sale of 241 used trailers on September 14, 2003, to be sold sight unseen and "where is." The Bank gave its consent for this sale of 241 used trailers to proceed on September 24, 2003, and released the certificates of title. In exchange the Bank received the sales proceeds of $120,500. At that time, Hyundai was not entitled to statutory notice of the sale.[6]

In the second set of sales that occurred between November and December of 2003, the Bank consented to the sale of another 38 used trailers for $53,052, the Bank released the 38 certificates of title, and the Bank received the sales proceeds. At the time of the November and December sales, Hyundai had a perfected security interest in the trailers and was entitled to notice of the sale. The Bank received a total of $173,552 from the sale proceeds of all 279 used trailers and released the certificates of title to the buyers.

Since the proceeds of the sales were insufficient to satisfy Trailer Source's debt to the Bank, Hyundai received no proceeds from the sales. It is undisputed that neither the Bank nor Hyundai ever had physical possession of the used trailers that were sold.

---

[6]Under Tenn. Code Ann. § 47-9-611(c)(3)(B), ten days must pass after a security interest is perfected before a creditor is entitled to notice of a sale of collateral. Consequently, the Bank was not obligated under Tenn. Code Ann. § 47-9-611 to notify Hyundai of the September sale of the used trailers. In the proceedings prior to this appeal, the courts have described Hyundai as unperfected during this 10 day period for purposes of notice under Tenn. Code Ann. §§ 47-9-610 and 611. *See AmSouth Bank v. Hyundai*, 206 S.W.3d 425, 435 (Tenn. Ct. App. 2006).

## D. Prior Proceedings Before The Trial Court And On Appeal

This case has been to the Court of Appeals previously to review the trial court's decision to grant the Bank partial summary judgment. On April 6, 2005, the trial court entered an order granting the Bank partial summary judgment dismissing several of Hyundai's counterclaims against the Bank and finding that Hyundai had no standing under Tenn. Code Ann. § 47-9-610 to challenge any disposition made by the Bank since Hyundai was not entitled to notice of the September sale under Tenn. Code Ann. § 47-9-611(c)(3)(B). In addition, the trial court made the following findings regarding the commercial reasonableness of the used trailer sales:

> The Court denies the summary judgment on the issue of the Bank's constructive possession of the trailers in issue. The Court concludes that there are genuine issues of material fact as to whether the Bank or Trailer Source had possession of the collateral/trailers for purposes of Tennessee Code Annotated section 47-9-207. The obligation of section 47-9-207 is imposed not just on strict possession but also where there is constructive possession. *See NationsBank v. Clegg*, 1996 WL 165513 (Tenn. Ct. App. 1996). In the case at bar the Court concludes that there are genuine issues of material fact as to whether the Bank had constructive possession of the trailers in issue based upon the combination of facts that the Bank undisputedly possessed the certificates of title to the trailers by virtue of writs of possession and that Trailer Source sought the permission of and was in frequent communication with the Bank about the disposition of the trailers. At trial the Court will need to hear testimony about these communications between the Bank and Trailer Source subsequent to the Bank obtaining the certificates of title to determine if the Bank exercised sufficient dominion and control of the trailers to constitute constructive possession of the trailers. **The legal significance of constructive possession** is that it triggers an obligation under the Tennessee Commercial Code to use reasonable care in the custody and preservation of collateral **as well as its disposition**.
>
> The Court dismisses Hyundai's arguments that possession of the trailers by the Bank is established as a matter of law through the application of estoppel. The Court concludes that the ordinary and plain meaning of the Bank's pleadings and its definition of collateral in its security interest include the certificates of title but do not extend to the trailers. (emphasis added).

Regarding sales of used trailers that occurred in November and December after Hyundai's security interest was perfected and Hyundai was entitled to statutory notice of the sale under Tenn. Code Ann. § 47-9-611(c), the trial court found as follows:

> As to Hyundai's claims for recovery of consequential damages for commercially unreasonable sales of 38 trailers subsequent to September 24, 2003, which sales occurred in November and December of 2003, the Court denies summary judgment. There are genuine issues of material fact as to whether control of the sales is attributable to Trailer Source or the Bank, *see In re Alcock*, 157 B.R. 23 (9th Cir. BAP 1993) and, thus, whether liability for conducting a commercially unreasonable sale is attributable to the Bank.

Although the commercial reasonableness of the sale of the 38 trailers remained pending, the trial court designated its summary judgment order as a final judgment under Tenn. R. Civ. Pro. Rule 54.02, and Hyundai appealed.

In *AmSouth Bank v. Trailer Source*, 206 S.W.3d 425, 434 (Tenn. Ct. App. 2006), this court reversed the trial court's April 2005 finding that Hyundai lacked standing to challenge the Bank's approval of the sales that occurred *before* Hyundai was entitled to notice of the sale under Tenn. Code Ann. § 47-9-611(c). The Court of Appeals was clear that the sole issue on appeal was the trial court's standing ruling.[7] *Id*. at 430, 433, and 436.

Without commenting on the merits of the controversy, this court held that where the alleged value of the collateral was sufficient to retire the Bank's debt, thus "freeing up" collateral to be applied to Hyundai's debt, then Hyundai had standing to challenge whether the used trailer sales by the Bank were commercially reasonable. *Id*. at 436. In other words, Hyundai had standing to challenge the sale regardless of whether it was entitled to notice under Tenn. Code Ann. § 47-9-611. *Id*.

> While failure to perfect a security interest drives the creditor to the bottom of the totem pole in priority, such does not destroy his interest in the property.

*Id*. at 434.

---

[7]This court noted a good faith issue was raised but not determinative to the appeal. *AmSouth*, 206 S.W.3d at 435-36.

### E. Trial Court Decision Currently On Appeal

On remand, Hyundai's counterclaim[8] was tried before the trial court between August 27 and 30, 2007. Prior to trial, the trial court entered an order making certain findings which included the following:

> The burden of proof is on Hyundai to demonstrate that the Bank actually or constructively disposed of the collateral and, if so, that the sale was commercially unreasonable.

The trial court decided issues surrounding the Bank's involvement in the sale of the trailers in its Memorandum and Order dated October 31, 2007.[9]

First, the trial court found that Tenn. Code Ann. § 47-9-610 applied to the Bank's participation in the sale. The trial court reasoned that the Bank had constructive possession of the trailers sold by Trailer Source since the Bank controlled the certificates of title and since Trailer Source consulted with the Bank to receive its permission to proceed with the sale. Based on its finding of constructive possession, the trial court held that the Bank had an obligation under Tenn. Code Ann. § 47-9-610 to dispose of the used trailers in a commercially reasonable fashion. The trial court relied on a alternate ground for its finding when later, in response to the Bank's motion to alter or amend, the trial court found in its April 28, 2008 order that "actual possession of the certificates of title gave the Bank control over the sale of the collateral thereby making the Bank liable for their commercially unreasonable disposition."

Finding that the Bank had an obligation under Tenn. Code Ann. § 49-9-610, the trial court then decided that the sales were commercially unreasonable. Based on the testimony of the valuation experts and the prices received when the trailers were resold, the trial court concluded that the 279 used trailers were sold below their actual value. The court further noted that the Bank did not attempt to receive other bids or appraisals before giving its consent to the sale.

---

[8]On remand, Hyundai filed an amended counterclaim alleging that the Bank conducted a commercially unreasonable disposition of 279 used trailers in violation of Tenn. Code Ann. § 47-9-610 and that the Bank failed to preserve collateral under Tenn. Code Ann. § 47-9-207 with regard to 107 trailers for which the Bank held certificates of title but were never located.

[9]Also at issue before the trial court was whether the loss of 107 trailers constituted failure to preserve collateral under Tenn. Code Ann. § 47-9-207. The trial court's finding that the Bank did not violate Tenn. Code Ann. § 47-9-207 regarding the 107 lost used trailers is not an issue on appeal.

The trial court then assessed damages for the Bank's failure to dispose of the trailers in a commercially reasonable fashion. The trial court credited the testimony of Mr. Winterfield, Director of Appraisal Services with Taylor & Martin, as to the accurate value of the 279 trailers at the time of their sale. There was testimony that had the used trailers been sold in an orderly fashion, the value assigned by Mr. Winterfield for the 279 trailers would total $548,950. From this amount the trial court subtracted the amount the Bank actually received from the sales of the 279 trailers, $173,552, resulting in the trial court's award to Hyundai of $375,398, plus prejudgment interest beginning December 8, 2003, and attorneys' fees.

The trial court concluded:

After considering the proof and argument of counsel, the Court concludes that the Bank had constructive possession of the 279 trailers in issue. With respect to these trailers, the court further concludes that the Bank did not undertake reasonable, standard measures to value the collateral before consenting to sales which were proven to be below the ordinary liquidation value of such collateral and, therefore, the Bank did not dispose of the collateral in a commercially reasonable manner. Crediting the testimony of the Bank's valuation expert on the ordinary liquidation value of the collateral, the Court concludes that Hyundai lost $375,398.00 from the deficient sales of the 279 trailers. In addition to the sales loss, the Court awards Hyundai interest at the rate of 6.25% to be computed beginning December 8, 2003, . . . .

The trial court granted the Bank's motion to alter the judgment by reversing its finding that Hyundai was entitled to attorney fees.[10] The Bank's request to otherwise alter or amend the judgment was denied.

The Bank appeals and asserts that the trial court made three errors. First, the Bank argues that it never had an obligation to act commercially reasonably under Tenn. Code Ann. § 47-9-610 because the trial court erred in its finding that the Bank had constructive possession of the 279 used trailers sold in the fall of 2003. Second, the Bank argues that even if Tenn. Code Ann. § 47-9-610 is applicable, its limited participation in the sales was not commercially unreasonable. Third, even if the Bank is found to have violated Tenn. Code Ann. § 47-9-610, the Bank argues the trial court erred in its damage calculation. Hyundai raised no challenges to the trial court's decision on appeal.

---

[10]On appeal, Hyundai does not contest the trial court's refusal to award attorney's fees.

## II. APPLICABILITY OF TENN. CODE ANN. § 47-9-610

### A. When Does Statutory Obligation Apply?

The statute governing disposition of collateral by a creditor is simple and clear, yet the complexity of its application is wholly dependent upon the factual situation facing the creditor.[11] Tenn. Code Ann. § 47-9-610(a) and (b) provide as follows:

> (a) DISPOSITION AFTER DEFAULT. After default, a secured party may sell, lease, license, or otherwise dispose of any or all of the collateral in its present condition or following any commercially reasonable preparation or processing.

> (b) COMMERCIALLY REASONABLE DISPOSITION. Every aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable. If commercially reasonable, a secured party may dispose of collateral by public or private proceedings, by one (1) or more contracts, as a unit or in parcels, and at any time and place and on any terms.

The plain language of Tenn. Code Ann. § 47-9-610(a) presents two obvious prerequisites for the applicability of subsection (b). First, the debtor must be in default and, second, the creditor must take some action to dispose of the collateral.[12] If these two requirements are met, then the disposition must be commercially reasonable.

In the matter before us, there is no dispute that Trailer Source was in default in its obligations to the Bank. The question, however, is whether the Bank's participation in the sales transactions constituted the type of creditor disposition referenced in the statute.

---

[11]One of the well regarded treatises on the Uniform Commercial Code describes the authority governing the commercially reasonable disposition thusly:

> Hundreds of reported opinions interpret the words . . . [of subsection (b)]. These cases make dismal reading for the secured creditor, they seem to be an endless repetition of the Peter Principle corollary: what can go wrong, will.

4 White & Summers, Uniform Commercial Code § 34-11 (6th ed.)

[12]The creditor is not *obligated* to dispose of the collateral under Tenn. Code Ann. § 47-9-610 as evidenced by the use of "may" in subsection (a). A creditor is likewise not even obligated to take possession of collateral after default. Tenn. Code Ann. § 47-9-609.

In order to decide whether the trial court erred in its finding that Tenn. Code Ann. § 47-9-610 governed the Bank's participation in the sale, it is necessary to first determine whether the trial court applied the correct test for its applicability. Three seemingly different standards were articulated by the trial court during the proceedings: whether the Bank "constructively disposed" of the collateral, whether the Bank had "constructive possession of the collateral," and whether actual possession of the certificates of title gave the Bank "control over the sale of the collateral." These iterations of the standard arose because the Bank herein never took actual physical control of the trailers, which were scattered around the country.

The parties, likewise, argue different standards on appeal. The Bank argues that Tenn. Code Ann. § 47-9-610 does not apply because the Bank was never in actual possession of the trailers, but only held the certificates of title. On the other hand, Hyundai argues that "the pivotal factual issue to be decided by the trial court . . . was whether the Bank controlled the sale of the 279 used trailers."

The facts of this case do not precisely fit the customary application of Tenn. Code Ann. § 47-9-609 and - 610. In the normal circumstance where there is a dispute about the commercial reasonableness of a sale, the creditor has obtained actual physical possession of the collateral itself under Tenn. Code Ann. § 47-9-609, and the debtor challenges the commercial reasonableness of its disposition under Tenn. Code Ann. § 47-9-610 in order to recover money or avoid a deficiency judgment. In that circumstance, it makes sense that the creditor has taken possession; otherwise a sale could rarely proceed without the debtor's agreement. Here, however, the Bank and the debtor agreed on a disposition, and the junior creditor is challenging the sale. Simply because this situation does not present the customary application of the statute, however, does not mean the statute is inapplicable. Tenn. Code Ann. § 47-9-610 protects not only debtors from unreasonable actions by a creditor, it also protects junior creditors.

Whether a creditor has possession of collateral, either actual or constructive, is not the litmus test for the applicability of Tenn. Code Ann. § 47-9-610. As mentioned above, when the dispute is between the debtor and creditor, then possession is obviously key since the creditor cannot usually sell what the debtor possesses. Obviously, actual physical possession by the creditor of the collateral is probably always sufficient control to trigger the obligation of Tenn. Code Ann. § 47-9-610. Here, the dispute is between two creditors. The issue is actually one of control - *i.e.*, whether the creditor has the control or leverage to approve or disapprove the transaction, *i.e.*, whether the secured party's participation in the disposition is necessary for its effectuation.

By its terms, Tenn. Code Ann. § 47-9-610 does not apply only to collateral in the creditor's possession. If there is a default and the creditor can arrange or participate in a sale prior to taking possession of the collateral, that is permitted under Tenn. Code Ann. § 47-9-610 *but* it must be done in a commercially reasonable fashion. In other words, Tenn. Code Ann. § 47-9-610 requires that if a creditor participates in a disposition of collateral after default, then that participation must be commercially reasonable. This obligation exists to protect others who have an interest in the collateral, namely, the debtor and other creditors. It would be unreasonable to limit this obligation only to situations where the creditor possesses the collateral. Consequently, the trigger for applicability of Tenn. Code Ann. § 47-9-610 in accordance with its terms is whether a creditor participates in the disposition of collateral after default.

## B. Whether The Bank Exercised The Requisite Control Over The Sales

The proof established that the Bank had control over whether the subject sales occurred.

There are several unique factors in this case which lead to the conclusion that the Bank had sufficient control over the sales such that the commercial reasonableness requirement of Tenn. Code Ann. § 47-9-610 applied. First, the Bank unambiguously elected to proceed against the collateral to satisfy the debt to it. The Bank received the certificates of title in response to a lawsuit where the Bank expressly informed the court that it intended to conduct UCC sales of inventory. Consequently, it was clear at the outset that the Bank was proceeding to obtain the collateral and sell it.

Second, whether or not the certificates of title constituted constructive possession is not the question, but it is clear that both the Bank and Hyundai considered possession of the certificates of title to be important to controlling the disposition of the trailers. It would raise form over substance to now suggest otherwise.

Third, the Bank concedes that it not only gave its consent to the sales, but also released the certificates of title in exchange for receiving the proceeds of the sale. In other words, the Bank leveraged possession of the certificates of title into a role in the sales so that the Bank would receive the proceeds of the sale.[13]

Finally, the purchaser of the used trailers, Fleetco, acknowledged the importance to Fleetco of the certificates of title. The representative testified that the sale would not have

_____

[13] These factors distinguish this case from situations where a creditor simply releases its security interest.

occurred absent the certificates of title.

Under these facts it is clear that the Bank elected to proceed against the collateral, sought the certificates of title in an attempt to control the disposition of the trailers to the extent it could, used the certificates of title as leverage to receive the proceeds of the sale, and the sales to Fleetco were dependent upon the Bank's release of the certificates of title. Based on these facts, we agree with the trial court's conclusion in its April 28, 2008 Order denying the Bank's motion to alter or amend that the Bank's possession of the certificates of title gave the Bank control over the sale of the used trailers, thus making the Bank responsible for their disposition.

The Bank cautions that our ruling could be construed as placing the commercially reasonable responsibility upon creditors after default who have elected not to proceed against the collateral by simply releasing their security interest. The UCC does not require the secured party to proceed against the collateral after default. The debtor may sell the collateral after default, and the Bank is correct that in that situation it has no obligation to insure that the sales are commercially reasonable under Tenn. Code Ann. § 47-9-610. That principle is clear and unaffected by our holding herein. However, if after default the creditor proceeds against the collateral and exercises control over sales by the debtor, then Tenn. Code Ann. § 47-9-610 is applicable.

### III. COMPLIANCE WITH TENN. CODE ANN. § 47-9-610

The trial court found that the Bank failed to dispose of the trailers in a commercially reasonable manner. According to the trial court's October 31, 2007 order, "the Bank did not undertake reasonable, standard measures to value the collateral before consenting to sales which were proven to be below the ordinary liquidation value of such collateral and, therefore, the Bank did not dispose of the collateral in a commercially reasonable manner." In other words, the Bank's failure to appraise the trailers and the failure to receive "ordinary liquidation value" were commercially unreasonable.

The salient facts regarding the sales approved by the Bank are not in dispute. Trailer Source had negotiated the sale of two hundred forty-one (241) trailers to Fleetco on September 14, 2003, before the Bank obtained the certificates of title. This sale was for 241 trailers at $500 each. It is important to note that the trailers were sold sight unseen, "as is" and "where is." No one disputes that neither the Bank nor Hyundai knew the locations of the trailers, but that they were scattered in several states. After the Bank gave its consent, the sale was consummated on September 24, 2003. Later in November and December, 35 other trailers were sold in much the same manner.

In order to determine whether the used trailers were disposed of in a commercially reasonable manner, one must look at the situation as presented to the creditor. The trial court did not fault the Bank for failing to prepare the trailers for resale or holding a sale itself, because the Bank did not actually have the trailers. The trial court found, however, that the Bank behaved in a commercially unreasonable fashion when it failed to have the trailers appraised. Since neither the Bank or Hyundai knew where the trailers were located, it would have been quite difficult to have them appraised. Such an appraisal, if possible, would likely be costly. Taking steps to physically locate and transport the trailers would also be costly. While lack of physical possession does not excuse the Bank from its obligation to dispose of the collateral in a commercially reasonable fashion, it does severely limit the avenues available to the Bank for disposition of the collateral.

According to Tenn. Code Ann. § 47-9-627(a), a disposition of collateral is made in a commercially reasonable manner if made:

(1) In the usual manner on any recognized market;
(2) At the price current in any recognized market at the time of the disposition; or
(3) Otherwise in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition.

It is undisputed that Trailer Source, a dealer in trailers, arranged for the sale of used trailers to Fleetco. These trailers were scattered in several states. The purchaser was willing to accept them "as is" wherever they were located. In effect, these were private sales allowed under Tenn. Code Ann. § 47-9-610(b). The Bank and Trailer Source had incentives to get a good price. The proceeds of this sale would benefit Trailer Source since it would reduce Trailer Source's debt to the Bank and would benefit the Bank by reducing the debt. Representatives of Trailer Source told the Bank the sale was a customary way of disposing of used trailers. As far as the Bank was aware, Trailer Source had no incentive to mislead the Bank or to otherwise sell the trailers for less than a reasonable price.

## A. Failure To Obtain Appraisal

We disagree with the trial court that the Bank was obligated to get an appraisal for the trailers prior to their sale. This is largely due to the fact that a dealer had arranged for a sale to a purchaser who was willing to buy them without condition. The very fact that a purchaser was willing to go find the trailers, something neither the Bank nor Hyundai had apparently been able to do, was significant. The purchaser was willing to take the trailers in whatever condition it found them, *i.e.*, "as is." Thus, the purchaser took the risk that some trailers would have no value.

Whether the Bank's failure to get an appraisal before agreeing to the sale was unreasonable must be considered in the context of the situation facing the Bank at the time it agreed. The debtor had already negotiated a sale, to a buyer who apparently regularly made such purchases of used trailers, for a large number of trailers at various (and unknown to the Bank) locations, and in varying and unknown condition. The Bank would not be required to expend resources to receive payment toward the debt, and the sale was ready to proceed forthwith, saving delay and potential costs thereof. The entire real world, practical situation facing the creditor must be considered in determining reasonableness. One element does not necessarily take predominance over all others.

> In a world where the recovery of deficiency judgments is far from certain, because the debtor is likely to be in Chapter 7 or to be without funds, why would the creditor not conduct a sale in a way that is likely to bring the best net price? If the probability of the recovery of a deficiency is low, the creditor's failure to conduct a proper sale falls on the creditor, not on the debtor. Unless we are to say that creditors are stupid (when the debtor cannot pay the deficiency), or vindictive and mean spirited (when the debtor can pay), we fail to understand the incentives for taking a low price and we see incentives for getting a high price. We suspect courts are unduly optimistic about the value of the goods and unduly receptive to the debtor's evidence of comparatively higher prices. **There may be a tendency to overestimate the ease of sale and to underestimate the cost and difficulty.** Courts should have skepticism about hired experts' testimony concerning the value of the collateral, about facile assertions concerning the ease of its resale and the large price that the collateral "could" bring.

> We believe that the courts should look mostly at the creditor's **good faith effort**. If the creditor puts forth what seems to be a good faith effort, this should be enough unless it is plain that the effort was commercially unreasonable.

4 White & Summers, Uniform Commercial Code § 34-11(f) (6th ed.) (emphasis added).

In view of the situation facing the Bank at the time, we cannot conclude that failure to obtain an appraisal was commercially unreasonable.

## B. Low Price

The other factor relied upon by the trial court was the low price for the trailers resulting from the Bank's approval of the sale to Fleetco. It is assumed for the purposes of

this appeal that the proceeds of the sale were below market value. It is important, however, to understand the role of price in our analysis of commercial reasonableness.

As a **practical** matter, price is everything. Absent a sale of collateral below its market value, there is no injury to the debtor or junior creditor no matter how unreasonable the method of sale may have been. If the sale has not deprived a party of its financial interest in the collateral, there is no claim. *See* 4 White & Summers, Uniform Commercial Code § 34-11(f) (6th ed.).

As a **legal** matter, however, while a sale that is below market value is a prerequisite to a recovery for a commercially unreasonable sale, it is not a guarantee. Tennessee Code Annotated § 47-9-627(a) provides that "[t]he fact that a greater amount could have been obtained by a . . . disposition . . . in a different method from that selected by the secured party is not of itself sufficient to preclude the secured party from establishing that the . . . disposition . . . was made in a commercially reasonable manner."

The trial court reached its finding that the sales price for 279 trailers was low by reference to later sales of these trailers by Fleetco to another party and in reliance on expert testimony about the value that would have been received under an orderly disposition, *i.e.*, "ordinary liquidation value." The Bank was in the unenviable position of possessing little leverage - the certificates of title. With little leverage comes the attendant little control. The Bank did not have possession of the trailers nor leverage sufficient to require an ordinary liquidation and, consequently, should not be held to that standard. At best, the Bank had veto authority over the sale of the 271 used trailers.

The trial court is reversed in its finding that the Bank conducted a commercially unreasonable disposition of the used trailers. The Bank was not in a position to obtain a meaningful appraisal, much less an orderly liquidation of the collateral. While the proceeds of the disposition may have been low, this alone does not prove the Bank's participation was commercially unreasonable.

## IV. CONCLUSION

Because we hold that the Bank's approval of the sale of the trailers was not commercially unreasonable, the trial court is reversed.[14]  Costs of this appeal are assessed against the appellee, Hyundai Translead.

_____
PATRICIA J. COTTRELL, P.J., M.S.

---

[14]Since we find the Bank did not violate Tenn. Code Ann. Ann. § 47-9-610, then the Bank's objection to the damage award is rendered moot.  Although not relevant to our decision, we note that the methodology used by the trial court appears flawed.  Tenn. Code Ann. Ann. § 47-9-625 provides that Hyundai is entitled to recover for "any loss caused by failure to comply with this chapter."  According to Hyundai, it was injured because if the Bank had disposed of the collateral in a commercially reasonable manner then *after* payment of the Bank debt there would have been a surplus to apply to the Hyundai debt.  The trial court erred when it found the damage to Hyundai was the difference between the price received by the Bank and the price that should have been received from a commercially reasonable disposition.  This formulation does not take into account the fact that as senior creditor, the Bank's debt has priority and the proceeds of the collateral must first be applied to its debt.  Consequently, the damage to Hyundai is the surplus, if any, that would have resulted from a commercially reasonable sale *after* payment of the Bank's debt since it was the senior creditor.  *See AmSouth Bank*, 206 S.W.3d at 430 and 434.