IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
April 11, 2017 Session

## DAMON HOLLAND v. BRIAN SULLIVAN, ET AL.

**Appeal from the Circuit Court for Davidson County**
**No. 16C86    Joseph P. Binkley Jr., Judge**

_____

### No. M2016-00538-COA-R3-CV

_____

The issues in this appeal arise from two very unorthodox agreements and the defendants' actions to avoid the consequences of the agreements. The agreements are unorthodox because, *inter alia*, each purports to be a "Bill of Sale" of an automobile when in fact each is a loan agreement for which the certificate of title is held by the lender as security. To complicate matters, the defendant who signed both agreements only owned one of the vehicles; his wife owned the other, and it is disputed whether the husband was authorized to act on her behalf. When the husband failed to pay either debt, the lender attempted unsuccessfully to possess the vehicles. Immediately thereafter, the husband and wife applied for and obtained new certificates of title and then used one of the duplicate titles to sell one of the automobiles to a third party. Thereafter, the lender commenced this action against the husband and wife for breach of contract, slander of title, and conspiracy to commit slander of title. The lender sought both compensatory and punitive damages. Following a bench trial, the court found the husband liable for breach of contract, and found the husband and wife jointly liable for slander of title and conspiracy to commit slander of title. The court then awarded compensatory damages in the amount of $32,456.89 and punitive damages in the amount of $30,000. The defendants appealed contending the trial court erred in failing to consider their affirmative defenses and in failing to hold that the Tennessee Title Pledge Act, Tenn. Code Ann. §§ 45-15-101 to -120 barred any recovery. They also contend that the evidence does not support a finding that the husband breached the contract or that they were jointly liable for slander of title and for conspiracy to commit slander of title. They further argue the trial court erred in awarding punitive damages. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed**

FRANK G. CLEMENT JR., P.J., M.S., delivered the opinion of the Court, in which ANDY D. BENNETT and JOHN W. MCCLARTY, J., joined.

Shannon L. Crutcher, Nashville, Tennessee, for the appellants, Brian Sullivan and Tamara J. Sullivan.

Casey Adam Long, Franklin, Tennessee, for the appellee, Damon Holland.

**OPINION**

On August 28, 2013, Damon Holland and Brian Sullivan executed a written agreement titled "Bill of Sale" that conveyed a 2013 BMW to Mr. Holland for $30,000. Concurrent with the execution of the Bill of Sale, Mr. Holland gave Mr. Sullivan $30,000, and Mr. Sullivan delivered to Mr. Holland the certificate of title to the BMW. But for Mr. Holland taking possession of the BMW, it would appear that a routine sales transaction had been concluded as of August 28, 2013. Well, it was neither routine nor concluded.

As the following reveals, the transaction was unorthodox, at best, for several reasons. One unorthodox aspect is that the Bill of Sale included a provision titled "Agreement to Resale Back to Brian Sullivan." Pursuant to this provision, Mr. Sullivan could repurchase the BMW within 10 days of the purchase date (August 28, 2013) for $33,000; within 33 days for $35,000; or, if beyond September 30, 2013, for $35,000 plus $5,000 for each additional month beyond September 30, 2013. Another unorthodox aspect of the transaction is that the parties had an oral agreement that Mr. Sullivan could retain possession of the BMW for an indeterminate time while Mr. Holland retained the certificate of tile. Another complicating factor is that, although Mr. Sullivan signed the Bill of Sale for the BMW, he did not own the BMW, and he did not have a power of attorney to sign a bill of sale. The registered owner of the vehicle was Mr. Sullivan's wife, Tamara Sullivan and while the certificate of title bore the signature "Tamara Sullivan," she denied having signed the title.

Two months later, Mr. Holland and Mr. Sullivan entered into an agreement pursuant to which Mr. Sullivan purportedly sold a 2013 Land Rover, which Mr. Sullivan owned, to Mr. Holland for $22,000. It was entitled "Bill of Sale of Motor Vehicle" but, unlike the previous bill of sale, this one did not contain a buy-back provision. Nevertheless, both Mr. Holland and Mr. Sullivan acknowledged that they had a "handshake agreement" to that effect and on terms similar to the prior agreement.

The parties executed the Bill of Sale of Motor Vehicle on November 6, 2013. Concurrent with the execution of the bill of sale, Mr. Sullivan delivered the signed certificate of title to the Land Rover, and Mr. Holland tendered $22,000 in cash to Mr. Sullivan but, by agreement of the parties, Mr. Sullivan retained $17,000 while Mr.

Holland retained $5,000.[1] As Mr. Holland explained, because Mr. Sullivan was still in possession of the BMW and intended to repurchase the BMW, it was agreed that Mr. Holland would apply the $5,000 to the repurchase price for the BMW. As had been done in the previous transaction, Mr. Sullivan retained possession of the Land Rover while Mr. Holland retained the title to the vehicle as security for the loan.

On May 20, 2014, Mr. Sullivan delivered two checks to Mr. Holland. One of them, check No. 1435, was payable to Music City Pawn, Mr. Holland's company, in the amount of $71,210. The other, check No. 1436, was payable to Mr. Holland in the amount of $48,000. However, Mr. Sullivan stopped payment on both checks before they were negotiated. At trial Mr. Sullivan testified that he stopped payment based on a subsequent agreement with Mr. Holland. He claimed that Mr. Holland agreed to return the titles to both vehicles in exchange for $5,000. Mr. Holland disputes having made any such agreement.

Three days later, and at the request of Mr. Holland, Mr. Sullivan wrote a check payable to the order of Tervice Burnett, Mr. Holland's sister and business partner, for $5,000. Mr. Sullivan added a note in the memo line of the check that stated: "Payment in full for Damon Holland and M.C.P. [Music City Pawn] for all outstanding loans. Replaces Check Numbers 1435 and 1436 for the cash received." Ms. Burnett cashed the check. At trial, Mr. Holland acknowledged that he requested the payment to Ms. Burnett but insisted that he would not have authorized her to cash the check if he had known what was written in the memo line.

In August 2014, Mr. Holland hired Harpeth Towing to take possession of both vehicles and to deliver them to him. When Harpeth Towing arrived at the Sullivans' home, Harpeth's employees immediately began loading the Land Rover onto the tow-truck. As they were loading it, the Sullivans came out and attempted to stop them, but Harpeth Towing was able to remove the Land Rover. However, the Sullivans prevented Harpeth Towing from removing the BMW.[2]

Although they had already dug themselves into a deep hole, a point at which most people stop digging, the Sullivans kept digging by driving to the Davidson County Clerk's Office, whereupon they applied for and obtained duplicate vehicle titles to both vehicles. After obtaining duplicate titles, the Sullivans used the duplicate title to sell the BMW to a third party.

---

[1] The transaction took place at a SunTrust Bank while Mr. Holland withdrew $22,000 in cash from an account owned by D&T Holdings, LLC d/b/a Music City Pawn, of which Mr. Holland was the sole member.

[2] The BMW was in the Sullivans' garage and the Sullivans would not let them in the garage.

Mr. Holland commenced this action against the Sullivans alleging claims for breach of contract, conversion, slander of title, and civil conspiracy. The Sullivans filed an answer and counterclaim, asserting claims against Mr. Holland for breach of contract and conversion of the Land Rover. In their counterclaim, the Sullivans appear to assert the following affirmative defenses as causes of action: accord and satisfaction; usury; fraud; and unlawful repossession; and that "if these transactions are deemed a title loan, that it is illegal and unenforceable for the amount is over the limits allowed by Tennessee Law."

The case was tried without a jury over two days. At the conclusion of the trial, the trial court stated its detailed findings of fact and conclusions of law from the bench, and we summarize the findings most pertinent to the issues on appeal as follows:

1.  Although both contracts are entitled "Bill of Sale," the contracts reflect loans rather a sale due to, *inter alia,* the ambiguity created by the buy-back provisions; the interest charges; the fact that the vehicles remained in the possession of the Sullivans; the fact that Mr. Holland did not sign the titles, record the titles, or pay sales tax on the transfer; and evidence of a similar transaction between the parties that occurred in 2010 with Mr. Sullivan successfully exercising the buy-back provision.
2.  Concerning the signatures on the vehicle titles, as to the BMW, the trial court stated, "I don't think Mrs. Sullivan signed [the BMW title]. . . . But . . . I'm not sure it's really that important to anything." As to the title for the Land Rover, the trial court found the signature on the title to be that of Mr. Sullivan. Nevertheless, the court further stated, "It's not that important really whether he sign[ed] it or didn't sign it. The parties intended to give [Mr. Holland] the titles to hold as security for the loans."
3.  The trial court found that Mrs. Sullivan's claim that she did not know about the sale of the BMW until the trial was not credible.
4.  As to whether the subject loan agreements are illegal and in violation of the Tennessee Title Pledge Act, Tenn. Code Ann. § 45-15-101 through 120, the trial court found that the loan agreements are not subject to the Tennessee Title Pledge Act because the transactions were "person-to-person" rather than "business-to-person." The trial court further found that should the opinion of the court regarding the application of Tenn. Code Ann. § 45-15-101 through 120 be in error, that such cause of action and defense has been waived by the Sullivans for failure to plead such cause of action or defense and having been raised for the first time during final arguments.
5.  The Sullivans did not plead the defense of accord and satisfaction prior to trial and it was therefore waived.

6. Mr. Sullivan breached the contract as to the BMW by failing to pay what was owed on the BMW and by failing to turn the vehicle over to Mr. Holland.

7. The Sullivans are liable of conspiracy because of the following: (1) there was a common design between the Sullivans each having intent and knowledge of the others intent to deprive Mr. Holland of his security interest; (2) conspiracy was accomplished by the Sullivans' concerted actions for an unlawful purpose when, after realizing that Mr. Holland was attempting to collect the security for the loan agreements, the Sullivans went to the County Clerk's office to obtain duplicate titles; and (3) overt actions occurred when the Sullivans applied for duplicate titles to both vehicles and sold the BMW.

8. The Sullivans are liable for slander of title for the following reasons: (1) Mr. Holland had an interest in property because he held the titles as securities for the loan; (2) the Sullivans published false statements about the property because they obtained duplicate titles and made false statements about the title to the property; (3) the Sullivans acted intentionally and maliciously because they knew Mr. Holland was attempting to gain possession of both vehicles, the Sullivans failed to inform the tow-service driver that the BMW was in their garage knowing that Mr. Holland sent the service to collect the security, and the Sullivans subsequently obtained duplicate titles; and (4) the foregoing false statements caused Mr. Holland pecuniary loss because Mr. Holland's security interest (the BMW) was sold.

9. The Sullivans are not guilty of conversion or trespass to chattels because they are the true owners of the vehicles.

10. Mr. Holland is entitled to punitive damages because Mr. Holland proved by clear and convincing evidence that the Sullivans acted intentionally.

Based on these and other findings, the trial court awarded Mr. Holland the 2013 Land Rover as his property, compensatory damages in the amount of $40,756.89 less the $8,300 already paid by the Sullivans, and punitive damages in the amount of $30,000 for a final net judgment of $62,456.89. Relying on Tenn. Code Ann. § 29-11-107, the trial court held the Sullivans jointly and severally liable for this judgment due to the Sullivans' liability for conspiracy and slander of title.[3] As for Mr. Holland's claims for conversion

---

[3] Tenn. Code Ann. § 29-11-107 reads in pertinent part as follows:

(a) If multiple defendants are found liable in a civil action governed by comparative fault, a defendant shall only be severally liable for the percentage of damages for which fault is attributed to such defendant by the trier of fact, and no defendant shall be held jointly liable for any damages.

(continued…)

- 5 -

and trespass to chattels, the court dismissed them on the finding that the Sullivans were the true owners of the vehicles. On February 23, 2016, the trial court entered an order consistent with its oral ruling. From that order, the Sullivans now appeal.

## ISSUES

The issues to be considered are as follows:

1. Whether the trial court erred in failing to consider the affirmative defenses raised by the Sullivans and in finding Tenn. Code Ann. § 45-15-101 to -120 did not apply to the loans made by Mr. Holland.
2. Whether the evidence supports finding Mr. Sullivan liable for breach of contract.
3. Whether the evidence supports finding the Sullivans jointly and severely liable for slander of title.
4. Whether the evidence supports finding that the Sullivans conspired to commit slander of title resulting in each being jointly and severely liable for the actions of the other.
5. Whether the trial court erred in awarding punitive damages.

## STANDARD OF REVIEW

"In all actions tried upon the facts without a jury, the court shall find the facts specially and shall state separately its conclusions of law and direct the entry of the appropriate judgment." Tenn. R. Civ. P. 52.01. If the trial court makes the required findings of fact, appellate courts review the trial court's factual findings de novo upon the record, accompanied by a presumption of the correctness of the findings, unless the preponderance of the evidence is otherwise. *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014) (citing Tenn. R. App. P. 13(d)). "For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect." *State ex rel. Flowers v. Tennessee Trucking Ass'n Self Ins. Grp. Trust*, 209 S.W.3d 595, 598-99 (Tenn. Ct. App. 2006).

---

(b) Notwithstanding subsection (a), the doctrine of joint and several liability remains in effect:

(1) To apportion financial responsibility in a civil conspiracy among two (2) or more at-fault defendants who, each having the intent and knowledge of the other's intent, accomplish by concert an unlawful purpose, or accomplish by concert a lawful purpose by unlawful means, which results in damage to the plaintiff;

Tenn. Code Ann. § 29-11-107(a) & (b)(1).

Requiring trial courts to make findings of fact and conclusions of law is generally viewed by courts as serving three purposes. First, findings and conclusions facilitate appellate review by affording a reviewing court a clear understanding of the basis of a trial court's decision. Second, findings and conclusions also serve "to make definite precisely what is being decided by the case in order to apply the doctrines of estoppel and res judicata in future cases and promote confidence in the trial judge's decision-making." A third function served by the requirement is "to evoke care on the part of the trial judge in ascertaining and applying the facts." Indeed, by clearly expressing the reasons for its decision, the trial court may well decrease the likelihood of an appeal.

*Lovlace v. Copley*, 418 S.W.3d 1, 34-35 (Tenn. 2013) (internal citations and footnotes omitted).

While there is no bright-line test by which to assess the sufficiency of the trial court's factual findings, the general rule is that "the findings of fact must include as much of the subsidiary facts as is necessary to disclose to the reviewing court the steps by which the trial court reached its ultimate conclusion on each factual issue." *Id.* at 35. "Simply stating the trial court's decision, without more, does not fulfill [the Rule 52.01] mandate." *Gooding v. Gooding*, 477 S.W.3d 774, 782 (Tenn. Ct. App. 2015) (quoting *Barnes v. Barnes*, No. M2011-01824-COA-R3-CV, 2012 WL 5266382, at *8 (Tenn. Ct. App. Oct. 24, 2012)).

If the trial court fails to explain the factual basis for its decisions, the appellate court "may conduct a de novo review of the record to determine where the preponderance of the evidence lies or remand the case with instructions to make the requisite findings of fact and conclusions of law and enter judgment accordingly." *Gooding*, 477 S.W.3d at 783) (citing *Lovlace*, 418 S.W.3d at 36); *Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn. 1997); *Nashville Ford Tractor, Inc. v. Great Am. Ins. Co.*, 194 S.W.3d 415, 424 (Tenn. Ct. App. 2005)).

Our review of a trial court's determinations on issues of law, however, is de novo, without any presumption of correctness. *Lind v. Beaman Dodge, Inc.*, 356 S.W.3d 889, 895 (Tenn. 2011).

**ANALYSIS**

I.      AFFIRMATIVE DEFENSES AND THE TITLE PLEDGE ACT

The trial court found that the Sullivans failed to plead affirmative defenses. Specifically, the court found that the Sullivans waived the Tennessee Title Pledge Act issue due to their "failure to plead such cause of action or defense." Moreover, the court

found the issue was first raised during final arguments at trial, which was too late. The court also found that "an accord or satisfaction of the debt is not a defense because such defense was not plead by the [Sullivans] prior to trial." We agree.

The Sullivans' answer to the complaint does not contain any affirmative defenses, at least none titled as "affirmative defenses" in the answer. More specifically, the Sullivans' answer to the complaint does not specifically identify the Tennessee Title Pledge Act or Tenn. Code Ann. § 45-15-101 to -120. In fact, their only reference to any type of loan in their answer is in Paragraph 66 which reads: "The contents of Paragraph #66 of the Complaint is denied and demand strict proof thereof. Mr. Holland and Mr. Sullivan's agreement was a loan with a repayment plan, not a purchase agreement." There are, however, vague references to "a title loan" in the prayer for relief in the Sullivans' Verified Counter-Complaint, which reads, "[The Sullivans] assert that if these transactions are deemed a title loan, that it is illegal and unenforceable for the amount is over the limits allowed by Tennessee Law." The trial court found that these statements failed to set forth an affirmative defense or a cause of action. We agree with the trial court.

Tenn. R. Civ. P. 8.03 sets the standard for raising an affirmative defense. It reads:

In pleading to a preceding pleading, *a party shall set forth affirmatively facts in short and plain terms relied upon* to constitute accord and satisfaction, . . . fraud, illegality . . . and any other matter constituting an affirmative defense. When a party has mistakenly designated a defense as a counterclaim or a counterclaim as a defense, the court, if justice so requires, shall treat the pleading as if there had been a proper designation.

(emphasis added).

In their pleadings, the Sullivans fail to provide a *short and plain statement of the facts or law relied upon* to constitute an illegal loan transaction.

Also significant to the issue is Tenn. R. Civ. P. 8.05, which sets the standard for stating a claim or defense relying upon the violation of a statute. The rule states:

Each averment of a pleading shall be simple, concise and direct. . . . *Every pleading stating a claim or defense relying upon the violation of a statute shall*, in a separate count or paragraph, either *specifically refer to the statute or state all of the facts necessary to constitute such breach so that the other party can be duly apprised of the statutory violation charged.*

Tenn. R. Civ. P. 8.05(1) (emphasis added). The Sullivans' pleadings, whether treated as a defense or a claim, do not identify the Tennessee Title Pledge Act or Tenn. Code Ann. § 45-15-101 to -120 as is required by Tenn. R. Civ. P. 8.05.

"Pleadings play an important role in litigation." *In re Estate of Baker v. King*, 207 S.W.3d 254, 265 (Tenn. Ct. App. 2006). The pleadings required by the Tennessee Rules of Civil Procedure provide the parties and the trial court with notice of the claims and defenses involved in the case. *Rawlings v. John Hancock Mut. Life Ins. Co.,* 78 S.W.3d 291, 300 (Tenn. Ct. App. 2001) (citing *Poster v. Andrews*, 189 S.W.2d 580, 582 (Tenn. 1943); *Hammett v. Vogue, Inc.*, 165 S.W.2d 577, 579 (Tenn. 1942)). Therefore, a defendant must put forth more than a conclusory statement that "X" defense applies. *See ACG, Inc. v. Southeast Elevator, Inc.*, 912 S.W.2d 163, 170 (Tenn. Ct. App. 1995) (holding that defendant waived the defense of estoppel even where the defendant explicitly stated the defense in the answer because the statement provided only conclusory allegations).

In this case, the Sullivans' pleadings do not set forth affirmative facts in short and plain terms related to any of the affirmative defenses identified in Tenn. R. Civ. P. 8.03 and they do not identify the Tennessee Title Loan Act by name or by Tenn. Code Ann. § 45-5-101 to -120. Moreover, their pleadings fail to provide the bare-minimum facts the rules require. Therefore, we find no error with the trial court's rulings that the Sullivans failed to properly plead any affirmative defenses, including the Tennessee Title Pledge Act.

## II.    BREACH OF CONTRACT

The Sullivans agree with the trial court's determination that the transactions at issue were loans, not contracts to sell the automobiles. Nevertheless, they contend the evidence does not support the finding that Mr. Sullivan is liable for breach of contract.

In their brief the Sullivans present their legal argument on this issue in one and one-half pages. The first half of the first page correctly recites the essential elements of a breach of contract claim with citations to the requisite authority. Unfortunately, the remainder of their argument cites no authority whatsoever. Moreover, their argument contains no citations to the record to identify where the relevant facts can be found, although their argument is that the evidence does not support the trial court's finding that Mr. Sullivan is liable for breach of contract.

The remainder of the Sullivans' argument on the breach of contract issue reads as follows:

The loans were against public policy in that Mr. Holland is not licensed to enter title pledge agreements in Tennessee under the TPA. Further, with

- 9 -

respect to the 2013 BMW, Mr. Sullivan could not legally enter an agreement to sell or encumber the vehicle because he was not the owner. Mr. Holland was aware the 2013 BMW was owned by Mrs. Sullivan. Regardless, Mr. Holland made the predatory loan to Mr. Sullivan secured by the 2013 BMW.

In addition, the written contracts lack sufficient information necessary to be enforceable. The agreements do not contain payment terms to even hint at the respective obligations of the Defendants. For the foregoing reasons, the evidence does not support finding Mr. Sullivan liable for breach of contract.

The Rules of Appellate Procedure require an appellant to include in the appellant's brief an argument that sets forth, *inter alia*: "the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record (which may be quoted verbatim) relied on; . . ." Tenn. R. App. P. 27 (a)(7).

In addition to the foregoing, Tenn. Ct. App. R. 6 requires the following content in a brief:

(a) Written argument in regard to each issue on appeal shall contain:

(1) A statement by the appellant of the alleged erroneous action of the trial court which raises the issue and a statement by the appellee of any action of the trial court which is relied upon to correct the alleged error, with citation to the record where the erroneous or corrective action is recorded.

(2) A statement showing how such alleged error was seasonably called to the attention of the trial judge with citation to that part of the record where appellant's challenge of the alleged error is recorded.

(3) A statement reciting wherein appellant was prejudiced by such alleged error, with citations to the record showing where the resultant prejudice is recorded.

(4) A statement of each determinative fact relied upon with citation to the record where evidence of each such fact may be found.

(b) No complaint of or reliance upon action by the trial court will be considered on appeal unless the argument contains a specific reference to the page or pages of the record where such action is recorded. No assertion of fact will be considered on appeal unless the argument contains a reference to the page or pages of the record where evidence of such fact is recorded.

The Sullivans' brief fails to satisfy these requirements. Namely, their brief is missing "authorities" to support their contentions that (1) the loans were against public policy, (2) Mr. Sullivan could not legally enter an agreement, (3) the loans were predatory, and (4) the written contracts lacked sufficient information necessary to be enforceable. *See* Tenn. R. App. P. 27(a)(7). Moreover, their brief fails to make "appropriate references to the record" they rely on to contend that the evidence does not support the finding at issue. *See id*. Furthermore, the Sullivans' brief fails to provide a statement of each determinative fact relied upon with citation to the record where evidence of each fact may be found or a reference to the pages of the record where evidence of such fact is recorded. *See* Tenn. Ct. App. R. 6(a)(4) and (b). Thus, the Sullivans' brief fails to comply with the requisite rules.

The deficiencies here are very similar to those in *Bean v. Bean*, 40 S.W.3d 52 (Tenn. Ct. App. 2000), where the appellant's "Argument" did not address the issues raised, and it did not "provide citations to facts in the record or provide citations of authority that support his allegations. . . ." *Bean* at 55. "Courts have routinely held that the failure to make appropriate references to the record and to cite relevant authority in the argument section of the brief as required by Rule 27(a)(7) constitutes a waiver of the issue." *Id*. (citing *State v. Schaller*, 975 S.W.2d 313, 318 (Tenn. Crim. App. 1997); *Rampy v. ICI Acrylics, Inc*. 898 S.W.2d 196, 210 (Tenn. Ct. App. 1994); *State v. Dickerson*, 885 S.W.2d 90, 93 (Tenn. Crim. App. 1993)). Courts have also held that an issue is waived when it is "simply raised without any argument regarding its merits." *Id.* at 56. (citing *Blair v. Badenhope*, 940 S.W.2d 575, 576-77 (Tenn. Ct. App. 1996); *Bank of Crockett v. Cullipher*, 752 S.W.2d 84, 86 (Tenn. Ct. App. 1988)).

This court is under no duty to verify unsupported allegations in a party's brief, or for that matter consider issues raised but not argued in the brief. *Id*. (citing *Duchow v. Whalen*, 872 S.W.2d 692, 693 (Tenn. Ct. App. 1993); *Airline Const. Inc., v. Barr*, 807 S.W.2d 247 (Tenn. Ct. App. 1990)). Because of the significant deficiencies in the argument on this issue, we decline to address the issue. *See id*.

### III.    SLANDER OF TITLE

The Sullivans contend that the trial court erred in four respects in finding they were liable for slander of title. The grounds for this contention are that: (1) slander of title does not apply to personal property; (2) the Sullivans made no false statement; (3) Mr.

- 11 -

Holland did not perfect his lien on the Land Rover, and thus, there was no notice of any interest possessed by Mr. Holland; and (4) Mr. Sullivan did not have legal authority to convey title of the BMW, and therefore, Mr. Holland could not have had legal title because it remained with Mrs. Sullivan.

To prevail on a slander of title claim, a plaintiff must prove that (1) he/she possessed an interest in the property, (2) the defendant published false statements about the title to the property, (3) the defendant acted maliciously, and (4) the false statement proximately caused the plaintiff a pecuniary loss. *Brooks v. Lambert*, 15 S.W. 3d 482, 484 (Tenn. Ct. App. 1999).

The Sullivans first contend that slander of title does not apply to personal property; however, they provide no authority to support their contention. Although our courts may not have determined whether slander of title applies to personal property, it is apparent from this court's application of the Restatement (Second) of Torts in previous cases that slander of title does apply to personal property. *See Harmon v. Shell*, No. 01-A-01-9211CH00451, 1994 WL 148663, at *4 (Tenn. Ct. App. Apr. 27, 1994) (no Tenn. R. App. P. 11 application filed) ("Slander of title now generally refers to the publication of false and malicious statements disparaging another's interest in real or *personal property* that the person making the statements should recognize as likely to result in pecuniary harm through the conduct of third persons with respect to the other's interest in the property." Restatement (Second) of Torts § 624 (1976) (emphasis added)). Therefore, we are of the opinion that slander of title does apply to personal property, and in this case, to the BMW.

For their second ground, the Sullivans contend they did not publish any false statements. The modest evidence the Sullivans ask us to consider is not significant enough to preponderate against the trial court's findings. Specifically, the Sullivans assert that it was not a false statement for Mr. Sullivan to claim that he owned the Land Rover or for Mrs. Sullivan to claim that she owned the BMW. The Sullivans, however, fail to mention that the published false statement stemmed not from a claim of ownership but from their actions in obtaining duplicate *titles* after they had already conveyed title to Mr. Holland in exchange for the loan.[4] Therefore, the evidence supports the finding that the Sullivans made false statements with regard to the titles to the vehicles.

---

[4] For the Sullivans to have obtained a duplicate title, the application required the Sullivans to state under penalty of perjury that the original was either lost, stolen, mutilated, returned due to non-delivery, altered, or illegible. *See* Tenn. Code Ann. § 55-3-115. However, the Sullivans' original titles were neither lost, stolen, mutilated, returned due to non-delivery, altered, or illegible, but rather, the titles were intentionally conveyed to Mr. Holland for a significant sum of money.

- 12 -

The Sullivans also contend the claim must fail because Mr. Holland did not perfect his security interest in the property. The trial court found that Mr. Holland had an interest in the property because he held titles to the vehicles as security for the loans. We agree.

"The agreement creating a security interest can be in any form—sale, consignment, lease, bailment—or whatever the parties can imagine. The agreement need not say that it is granting a security interest." *In re Village Import Enterprises, Inc.*, 126 B.R. 307, 309 (Bankr. E.D. Tenn. 1991). Therefore, the unorthodox "Bill of Sale" may be properly construed as a security agreement from which Mr. Holland's security interest arises.

The fact that Mr. Holland did not perfect his security interest is of no consequence in this case because doing so is not necessary to protect one's security interest against the debtor. Perfection is only relevant as to claims by third parties. *See AmSouth Bank v. Trialer Source, Inc.*, 206 S.W.3d 425, 434 (Tenn. Ct. App. 2006) ("A security interest that is unperfected but has attached is enforceable against both the debtor and general unsecured creditors." Rev. UCC § 9–201(a). However, an unperfected security interest . . . still has a multitude of weaknesses.") Therefore, Mr. Holland did have a valid security interest in the BMW, notwithstanding the fact that he did not perfect his security interest.

For their fourth ground, the Sullivans contend that Mr. Sullivan did not have legal authority to convey title of the BMW; therefore, Mrs. Sullivan owned the vehicle when they applied for a duplicate title. It is important to first recognize that this ground has no relevancy to the Range Rover because Mr. Sullivan was the registered owner of that vehicle. Additionally, he made false claims to obtain a duplicate title for that vehicle, all the while knowing that Mr. Holland had the original title and a security interest in the vehicle.

As for the BMW, this argument assumes that Mr. Sullivan obtained possession of the title without his wife's permission, forged her signature, and delivered the original signed title to Mr. Holland along with the bill of sale/secured loan agreement. The problem with this assumption is that the trial court made specific findings of fact that contradict this contention, and the evidence does not preponderate against the trial court's findings. More importantly, the findings of fact are principally based on the court's determination that the testimony of Mrs. Sullivan was not credible. Credibility determinations are uniquely within the discretion of the trial court.

Appellate courts give great weight to a trial court's factual findings that rest on determinations of credibility and weight of oral testimony. *State ex rel. Flowers v. Tennessee Trucking Ass'n Self Ins. Grp. Trust*, 209 S.W.3d 595, 599 (Tenn. Ct. App. 2006) (citing *Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997)); *see Woodward v. Woodward*, 240 S.W.3d 825, 828 (Tenn. Ct. App. 2007). When it comes to live, in-court witnesses, appellate courts afford trial courts considerable deference when

reviewing issues that hinge on the witnesses' credibility because trial courts are "uniquely positioned to observe the demeanor and conduct of witnesses." *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014) (quoting *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000)). "[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." *Id*. (quoting *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999)) (alteration in original). Having reviewed the record, we find no abuse of discretion in the trial court's credibility determinations.

The trial court made specific findings of fact concerning each element of the slander of title claim to conclude that Mr. Holland met his burden in regards to each of these elements. The relevant findings of fact include:

> (1) Plaintiff had an interest in property because he held the titles as securities for the loan.
> (2) Defendants published false statements about the property. Both Defendants obtained duplicate titles and they were false statements about the title to the property.
> (3) Defendants acted maliciously because they knew Plaintiff was attempting to gain possession of both vehicles. The BMW was in their garage and was not revealed to the tow truck driver. After Mr. and Mrs. Sullivan knew Mr. Holland was trying to get the vehicles back, they both went to county court clerk and applied for duplicate titles.
> (4) Those false statements caused Plaintiff's loss because the BMW was sold.

The evidence in the record does not preponderate against any of these findings. Therefore, we find no error with the trial court's decision on this issue

## IV.    CONSPIRACY TO COMMIT SLANDER OF TITLE

The Sullivans contend the trial court erred by holding them liable for conspiracy to commit slander of title. They contend they could not act in concert to obtain duplicate titles because they did not co-own the vehicles and, as a consequence, each of them had to make a separate application for a duplicate title. They also contend Mrs. Sullivan lacked sufficient knowledge to conspire, relying in principal part on one comment the trial court made from the bench, that being "Doesn't sound like she knows a lot."

For his part, Mr. Holland contends there is sufficient evidence to support the findings that the Sullivans jointly made the decision to obtain duplicate titles. To support his contention, Mr. Holland asserts that the Sullivans went together to apply for and obtain duplicate titles and that the trial court's comment about Mrs. Sullivan's

knowledge, or lack thereof, appeared to be "an expression of sarcasm based upon Mrs. Sullivan's demeanor and lack of candor with the trial court on the day of trial."

The elements of a cause of action for civil conspiracy are: (1) a common design between two or more persons; (2) to accomplish by concerted action an unlawful purpose, or a lawful purpose by unlawful means; (3) accompanied by an overt act in furtherance of the conspiracy; and (4) a resulting injury.[5] *Kincaid v. SouthTrust Bank*, 221 S.W.3d 32, 38 (Tenn. Ct. App. 2006) (citing *Morgan v. Brush Wellman, Inc.*, 165 F.Supp.2d 704, 720 (E.D. Tenn. 2001)). Upon a finding of conspiracy, each conspirator is liable for the damages resulting from the wrongful acts of all co-conspirators in carrying out the common scheme. *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 703 (Tenn. 2002) (citing *Brown v. Birman Managed Care, Inc.*, 42 S.W.3d 62, 67 (Tenn. 2001)).

Here, Mr. and Mrs. Sullivan jointly pursued a common design to deprive Mr. Holland of his security interest in the vehicles by making false applications for duplicate titles. The Sullivans engaged in two overt acts in furtherance of this conspiracy. First, as the trial court correctly described it, they went together "to the county court clerk's office and obtained duplicate titles in an attempt to deprive Plaintiff of his security . . . ." Second, they used one of the unlawfully obtained duplicate certificates of title to sell Mrs. Sullivan's BMW to a third-party, knowing all the while that Mr. Holland possessed a security interest in the vehicle. As a result, Mr. Holland lost his security interest in the $35,000 BMW.

The evidence supports the trial court's finding that the Sullivans acted in concert. At trial, Mr. Sullivan testified that he and his wife jointly decided to obtain duplicate titles and they went together to apply for the duplicate titles. The record also supports the court's finding that Mrs. Sullivan knowingly participated in the conspiracy. In fact, Mrs. Sullivan admitted at trial that the $5,000 payment was remitted with the hope that it would extinguish the debt owed on her BMW, a fact she knew prior to applying for the duplicate title. The record also establishes that she knew Harpeth Towing was attempting to possess her BMW in order to deliver it to Mr. Holland. Therefore, we affirm the trial court's decision.

## V. PUNITIVE DAMAGES

The Sullivans put forth two arguments that the trial court erred in its award of punitive damages. First, the Sullivans argue that the trial court erred because the only

---

[5] A civil conspiracy also requires an underlying predicate tort allegedly committed pursuant to the conspiracy. *Watson's Carpet & Floor Coverings, Inc. v. McCormick*, 247 S.W.3d 169, 186 (Tenn. Ct. App. 2007) (citations omitted). In this case the underlying predicate tort is slander of title.

- 15 -

action in which punitive damages may be awarded is slander of title. The Sullivans' second argument is that this case is not one of the "most egregious cases" as contemplated in *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896 (Tenn. 1992).

In addressing the first argument, the Sullivans take issue with the trial court's finding by clear and convincing evidence that the Sullivans acted intentionally but not maliciously. Specifically, the Sullivans argue that to sustain an action for punitive damages, a plaintiff may only rely on the mental states contained within the elements of the tort which gives rise to punitive damages. For example, the tort of intentional infliction of emotional distress ("IIED") requires the finding of an intentional act. While punitive damages may be awarded when a defendant acts intentionally, fraudulently, maliciously, or recklessly, the Sullivans would argue that under an IIED claim, a plaintiff may only be awarded punitive damages if plaintiff proved defendant acted intentionally by clear and convincing evidence, and therefore, the other mental states should be ignored.

The Sullivans provide no authority to support their contention, and we find none. A court may award punitive damages if it finds that a defendant acted intentionally, fraudulently, maliciously, or recklessly. *Id*. A person acts intentionally when that person acts with "the conscious objective or desire to engage in the conduct or cause the result." *Id*. Furthermore, "because punitive damages are to be awarded only in the most egregious of cases, a plaintiff must prove the defendant's . . . conduct by clear and convincing evidence." *Id*. Here, the trial court found that the Sullivans acted intentionally by clear and convincing evidence. From a review of the record, the evidence supports this conclusion.

In *Hodges*, our Supreme Court refined the type of conduct and cases for which punitive damages could be awarded in Tennessee, but as the court explained, it was their intent to restrict the availability of punitive damages without "dull[ing] the potentially keen edge of the doctrine as an effective deterrent of truly reprehensible conduct." *Id*. at 901 (quoting *Tuttle v. Raymond*, 494 A.2d 1353, 1361 (Me. 1985)). After explaining their reasoning, the Court established the new standard, which remains in effect today:

> In Tennessee, therefore, a court may henceforth award punitive damages only if it finds a defendant has acted either (1) *intentionally*, (2) fraudulently, (3) maliciously, or (4) recklessly.
>
> *A person acts intentionally when it is the person's conscious objective or desire to engage in the conduct or cause the result*. Cf. T.C.A. § 39-11-302(a) (1991) (criminal definition of "intentional"). . . .

*Id*. (emphasis added).

- 16 -

The Sullivans made the intentional decision to deprive Mr. Holland of his security interest in the vehicles after Mr. Holland attempted to possess the BMW. They accomplished their goal by obtaining duplicate titles based on the false representations that the titles were lost and then by using the duplicate titles to sell the BMW.

As for the Sullivans' argument that the court should not have awarded punitive damages because this case is not one of "the most egregious" as contemplated by *Hodges*, it is apparent that they misconstrue the applicable standard. When the Court adopted the more restrictive *Hodges* standard, the Court made it clear that it was the Court's intent to restrict the availability of punitive damages without "dull[ing] the potentially keen edge of the doctrine as an effective deterrent of truly reprehensible conduct." *Id*. (quoting *Tuttle*, 494 A.2d at 1361). Further, the Court explained:

> [B]ecause punitive damages are to be awarded only in the most egregious of cases, a plaintiff must prove the defendant's intentional . . . conduct by clear and convincing evidence. This higher standard of proof is appropriate given the twin purposes of punishment and deterrence: fairness requires that a defendant's wrong be clearly established before punishment, as such, is imposed; awarding punitive damages only in clearly appropriate cases better effects deterrence.

*Id*.

Here, Mr. Holland proved by the clear and convincing standard that the Sullivans acted intentionally and by unlawful means to deprive him of his property interest in the BMW. Thus, as the trial court correctly found, Mr. Holland satisfied the requirements for an award of punitive damages. Accordingly, we find no error with this decision.

## IN CONCLUSION

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against the appellants, Brian and Tamara J. Sullivan.

_____
FRANK G. CLEMENT JR., P.J., M.S.